KARL MAYER-WITTMANN, EXECUTOR (ESTATE OF
GERDA MAYER-WITTMANN) *v.* ZONING BOARD
OF APPEALS OF THE CITY OF
STAMFORD ET AL.
(SC 19972)

Robinson, C. J., and D'Auria, Mullins, Kahn, Ecker and Vertefeuille, Js.*

*Syllabus*

Pursuant to the Stamford Zoning Regulations (article IV, § 10 [C]), when a
legally nonconforming building has been damaged by a flood or other
calamity, the building "may be reconstructed and used as before" if
reconstruction is commenced within twelve months of the calamity.

The plaintiff appealed from the judgment of the trial court, which dismissed
his appeal from the decision of the defendant zoning board of appeals
granting the application of the defendant property owner, B, for vari-
ances in connection with the reconstruction of a cottage on his property
after the cottage was severely damaged by a hurricane. The plaintiff
owned real property adjacent to B's beachfront property. The cottage
was nonconforming under the Stamford Zoning Regulations in several
respects, including its location in relation to various setback require-
ments, its height of eighteen feet, ten inches, and its elevation of 8.7
feet. Pursuant to the zoning regulations, the maximum height for an
accessory structure such as the cottage is fifteen feet and the minimum
elevation standard for such a structure is sixteen feet, as its location
makes it subject to certain zoning regulations applicable to flood prone
areas. Nevertheless, because the cottage had been built before the zoning
regulations at issue were adopted, it constituted a legally nonconforming
structure. Following the hurricane, the cost to repair the cottage
exceeded 50 percent of its value, and, in order for it to be reconstructed,
the zoning board required that B conform the cottage to certain regula-
tions governing flood prone areas, including the minimum elevation
requirement. B applied for variances from the building height and set-
back requirements of the regulations because it would have been impos-
sible for him to conform both to the fifteen foot maximum height allowed
for the cottage and to the minimum flood elevation of sixteen feet, and
because restoration of the cottage required that it be moved three feet
north in order to be constructed on soils that could support the minimum
flood elevation. The zoning board of appeals ultimately approved B's

* This appeal originally was argued before a panel of this court consisting
of Chief Justice Robinson and Justices D'Auria, Mullins, Kahn and Ecker.
Thereafter, Justice Vertefeuille was added to the panel and has read the
briefs and appendices, and listened to a recording of oral argument prior
to participating in this decision.

Mayer-Wittmann *v.* Zoning Board of Appeals

application for the variances, and the plaintiff appealed to the trial court. The trial court dismissed the plaintiff's appeal, concluding that the record supported the zoning board's determinations that the zoning regulations applicable to flood prone areas imposed a hardship on B that justified the granting of the variances and that the variances were the minimal relief required to alleviate the hardship. The plaintiff, on the granting of certification, appealed. *Held*:

1. The plaintiff could not prevail on his claim that B's failure to begin reconstruction of the cottage within twelve months of the hurricane caused its legally nonconforming status to be terminated under article IV, § 10 (C), of the zoning regulations: when, as in the present case, a legally nonconforming building subject to zoning regulations applicable to flood prone areas is damaged and the cost of repairs exceeds 50 percent of the value of the building, the minimum flood elevation requirement applies to the repair of the building, notwithstanding the fact that the building previously had a legally nonconforming status with respect to that requirement, and notwithstanding article IV, § 10 (C), which authorizes the reconstruction "as before" of buildings damaged in a calamity within twelve months of the calamity; accordingly, article IV, § 10 (C), did not apply to the cottage because it would have been impossible for B to reconstruct the cottage "as before" without either conforming to the minimum elevation requirement or seeking a variance from that requirement, as the purpose of the prohibition of the reconstruction of a building that is nonconforming with the minimum flood elevation requirement to its previous state if the cost of the repairs exceeds 50 percent of the value of the building was not to deprive the building entirely of its legally nonconforming status but to ensure the maximum possible compliance with the regulations applicable to flood prone areas; moreover, the fact that the building cannot be reconstructed without either complying with the minimum flood elevation requirement or obtaining a variance from that requirement or obtaining a variance from the height restriction did not mean that the reconstructed building must comply with all other regulations with which it was previously nonconforming, and, accordingly, the cottage retained its status as a legally nonconforming accessory structure with respect to the setback and building height requirements in the regulations.

2. The trial court correctly determined that the zoning board of appeals properly granted B's application for variances from the setback requirements and the height restrictions in the regulations, the zoning board having reasonably found that B established the existence of an unusual hardship warranting approval of his application because strict enforcement of the regulations would have deprived him of his constitutionally protected right to continue using the cottage, an existing, legally nonconforming accessory structure; moreover, this court rejected the plaintiff's claim that, when an applicant seeks a variance that will have the effect of reducing a nonconformity of an existing, legally nonconforming build-

Mayer-Wittmann *v.* Zoning Board of Appeals

ing, the variance may not be granted unless the applicant reduces all of the building's nonconformities to the maximum extent possible, as any reduction in nonconformity presumably could only benefit the zoning scheme.

(*Two justices concurring separately in one opinion*)

Argued January 15—officially released November 5, 2019

*Procedural History*

Appeal from the decision of the named defendant granting the application for variances filed by the defendant Paul E. Breunich, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Hon. Edward R. Karazin,* judge trial referee, who, exercising the powers of the Superior Court, rendered judgment dismissing the appeal, from which the plaintiff, on the granting of certification, appealed. *Affirmed.*

*Scott T. Garosshen*, with whom were *Brendon P. Levesque* and, on the brief, *William I. Haslun II*, for the appellant (plaintiff).

*James V. Minor*, special corporation counsel, with whom, on the brief, was *Kathryn Emmett*, director of legal affairs, for the appellee (named defendant).

*Peter M. Nolin*, with whom were *Jacqueline O. Kaufman* and, on the brief, *Timothy A. Smith*, for the appellee (defendant Paul E. Breunich).

*Opinion*

VERTEFEUILLE, J. The issue that we must decide in this appeal is whether the named defendant, the Zoning Board of Appeals of the City of Stamford (zoning board), properly granted the application of the defendant Paul E. Breunich for variances to reconstruct a legally nonconforming accessory structure on his property after it was severely damaged by a hurricane. Breunich sought variances from various setback requirements and height restrictions of the Stamford zoning regulations on the ground that, as applied to his prop-

333 Conn. 624　　NOVEMBER, 2019　　　627

Mayer-Wittmann *v.* Zoning Board of Appeals

erty, their strict enforcement would impose an unusual hardship because he could not comply both with those regulations and with the regulations applicable to flood prone areas, which required him to elevate the structure. The Planning Board of the City of Stamford (planning board) unanimously recommended approval of the application, and, after a hearing, the zoning board unanimously approved it. The plaintiff, Karl Mayer-Wittmann, executor of the estate of Gerda Mayer-Wittmann, who owns property adjacent to Breunich's property, appealed from the decision of the zoning board to the trial court, which, after a trial, dismissed the appeal. This appeal followed.[1] We affirm the judgment of the trial court.

The record reveals the following facts that were found by the trial court or that are undisputed. Breunich owns a 0.96 acre beachfront property located at 106 Carter Drive in Stamford. The property, which includes three dwelling structures with a total of five dwelling units, two sheds and a garage, is located within the R-10 single family district, low density zone. Breunich's property is nonconforming to the Zoning Regulations of the city of Stamford (regulations)[2] but, because the property's structures, including the structure the parties refer to as the "sea cottage," were built before the zoning regulations were adopted in 1951, they are legally authorized nonconforming structures under the regulations. See Stamford Zoning Regs., art. IV, § 10 (A) (2015); see also General Statutes § 8-2 (a)[3] (zoning

_____

[1] The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The regulations have been amended since the events underlying the present case. All references herein are to the regulations as adopted November 30, 1951, with subsequent amendments through December 31, 2015.

[3] Although § 8-2 has been amended by the legislature several times since the events underlying the present case; see, e.g., Public Acts 2017, No. 17-155, § 2; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

Mayer-Wittmann *v.* Zoning Board of Appeals

"regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations"). The sea cottage, the building at issue in the present case, is an accessory structure containing a single dwelling unit that is nonconforming in several respects. Specifically, the sea cottage is located twenty-three feet from the rear yard property line, in violation of the thirty foot minimum required by article III, § 4 (AA) (2.4) (e), of the regulations, and it is located four feet, six inches from the side yard property line, in violation of the ten foot minimum required by article III, § 4 (AA) (2.4) (e). In addition, the lowest horizontal structural member of the sea cottage has an elevation of 8.7 feet, although the minimum elevation standard for the structure is sixteen feet under the zoning regulations applicable to flood prone areas.[4] Finally, the sea cottage has a height of eighteen feet, ten inches, whereas article III, § 6 (D), of the regulations provides that detached accessory structures may not exceed fifteen feet in height.

The sea cottage was severely damaged by Hurricane Sandy in late October, 2012, and Breunich wishes to rebuild it. Because the cost of repairs exceeds 50 percent of the sea cottage's value, however, the zoning board and Breunich agree that the sea cottage must conform to certain current regulations governing flood prone areas, including the minimum elevation require-

---

[4] The structure is within the VE and AE Flood Zones under Federal Emergency Management Agency (FEMA) standards, which are incorporated into the regulations. See Stamford Zoning Regs., art. III, § 7.1 (B) (2) (2015) (defining base flood elevation); id., § 7.1 (B) (20) (referring to FEMA's flood insurance rate map, which delineates "special flood hazard areas"); id., § 7.1 (C) (1) (§ 7.1 of regulations, governing flood prone areas, applies to "all areas of special flood hazard" within city); id., § 7.1 (C) (2) (special flood hazard areas are based on base flood elevation data developed by FEMA). Under FEMA standards, the minimum elevation for structures in the VE Flood Zone is fifteen feet. Article III, § 7.1 (B) (32) of the Stamford Zoning Regulations defines "[m]inimum [e]levation [s]tandard" as the minimum required by the FEMA standards plus one foot.

Mayer-Wittmann *v.* Zoning Board of Appeals

ment, notwithstanding the fact that the sea cottage is a legally nonconforming structure. See Stamford Zoning Regs., art. III, § 7.1 (B) (43) (2015) (for purposes of zoning regulations governing flood prone areas, "[s]ubstantial [d]amage" is defined as "damage . . . sustained by a structure, whereby the cost of restoring the structure to its pre-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred"); id., art. III, § 7.1 (B) (44) (defining "[s]ubstantial [i]mprovement" to include repairs "the cumulative cost of which equals or exceeds [50] percent . . . of the market value" of structure); id., art. III, § 7.1 (D) (1) (requiring substantial improvements to comply with certain regulations governing flood prone areas); id. (requiring all substantial improvements within special flood hazard area to have lowest floor elevated to minimum elevation standard).[5]

As we indicated, under the regulations applicable to flood prone areas, the minimum flood elevation requirement for the lowest horizontal structural member of the sea cottage is sixteen feet above the base flood elevation, whereas the maximum height allowed in the R-10 zone for accessory structures is fifteen feet. See id., art. III, §§ 6 (D) and 7.1. Because the lowest horizontal structural member of the sea cottage, which is at ground level, is currently 8.7 feet above base flood elevation, elevating the sea cottage by 7.3 feet to satisfy the mini-

_____

[5] Breunich also makes a passing reference to article IV, § 10 (B), of the Stamford Zoning Regulations, which provides that "[t]he total structural repairs and alterations that may be made in a structure which is nonconforming in use only shall not exceed [50] percent . . . of its replacement value at the time of application for the first structural change, unless changed to a conforming use." The plaintiff also does not address this regulation at any length but merely notes in a footnote in his reply brief that, assuming that Breunich is correct that the regulation applies, he "did not request a variance on the basis that his total repairs would exceed 50 percent of the value of the cottage." We address the effect of this regulation in footnote 13 of this opinion.

Mayer-Wittmann *v.* Zoning Board of Appeals

mum flood elevation requirement would leave only 7.7 feet of buildable vertical space if the structure also were required to conform to the building height requirement. Accordingly, it would be impossible for the sea cottage to conform to both requirements. Moreover, because the soils on which the sea cottage is currently standing cannot support the foundation that would be required to elevate the sea cottage to the minimum flood elevation, restoration of the sea cottage requires moving it three feet to the north. Accordingly, Breunich applied for variances from the building height and setback requirements of the regulations.

The planning board unanimously recommended that the zoning board approve Breunich's application for variances. After a hearing at which both Breunich and a representative of the plaintiff appeared, the zoning board granted Breunich's application subject to certain restrictions that are not at issue in this appeal. The plaintiff then appealed to the trial court, claiming, inter alia, that the zoning board improperly granted the variances because Breunich had not established that, without them, he would be deprived of the reasonable use of his property, as is required to establish a hardship, or that the variances were the minimum relief necessary. In addition, the plaintiff claimed that any hardship was "personal and self-inflicted" because Breunich failed to rebuild the sea cottage within twelve months of the hurricane. Specifically, he contended that Breunich could have rebuilt the sea cottage pursuant to article IV, § 10 (C), of the regulations,[6] which authorizes the owner of a nonconforming building that has been damaged by flood or other calamity to reconstruct and use

[6] Article IV, § 10 (C), of the Stamford Zoning Regulations provides in relevant part: "Any non-conforming building . . . which has been or may be damaged by . . . flood . . . [or] act of God . . . may be reconstructed and used as before, if reconstruction is started with[in] twelve . . . months of such calamity . . . ."

Mayer-Wittmann *v.* Zoning Board of Appeals

the building as before within twelve months of the damage, and that his failure to do so terminated the legal nonconforming status of the sea cottage on October 29, 2013, one year after it was damaged in the hurricane.

The trial court concluded that the zoning board's determinations that the regulations applicable to flood prone areas imposed a hardship on Breunich that justified granting the variances and that the variances were the minimal relief required to alleviate the hardship were supported by the record. The court also agreed with Breunich's claim that the zoning board could have granted the variances on the ground that the variances reduced the sea cottage's nonconformities. Accordingly, the court dismissed the plaintiff's appeal.

On appeal to this court, the plaintiff renews his claims that the zoning board improperly granted the variances because Breunich had not established a hardship by showing that enforcement of the regulations would deprive him of all reasonable use of his property or render his lot completely unusable, and the variances were not the minimal relief required to alleviate any hardship. In addition, the plaintiff again contends that Breunich is barred by article IV, § 10 (C), of the regulations from rebuilding the sea cottage because its legally nonconforming status has terminated. We conclude that the sea cottage retains its status as a legally nonconforming accessory structure and that the zoning board properly granted the variances on the ground that the enforcement of the regulations would create a hardship.

I

Because the question of whether the sea cottage retains its status as a legally nonconforming structure has bearing on the question of whether the zoning board properly granted the variances, we first address the plaintiff's contention that that status terminated one year after the sea cottage was damaged by the hurricane

Mayer-Wittmann *v.* Zoning Board of Appeals

pursuant to article IV, § 10 (C), of the regulations. The defendants contend that that provision does not apply to the sea cottage because the "fundamental predicate" that it was possible, as a matter of law, for the sea cottage to be "reconstructed and used as before" it was damaged; see Stamford Zoning Regs., art. IV, § 10 (C) (2015); without any need to apply for variances, has not been met.[7] We agree with the defendants.

"Because the interpretation of the regulations presents a question of law, our review is plenary. . . . Additionally, zoning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . . The process of statutory interpretation involves the determination of the meaning of the statutory language [or the relevant zoning regulation] as applied to the facts of the case, including the question of whether the language does so apply." (Citations omitted; internal quotation marks omitted.) *Graff* v. *Zoning Board of Appeals*, 277 Conn. 645, 652, 894 A.2d 285 (2006).

We begin our analysis with the language of article IV, § 10 (C), of the Stamford Zoning Regulations: "Any non-conforming building . . . which has been or may be damaged by . . . flood . . . [or] act of God . . . may be reconstructed and used as before, if reconstruction is started [within] twelve . . . months of such calamity . . . ." Thus, the regulation provides that, when a building has been damaged in a "calamity" and the owner commences reconstruction within twelve

_____

[7] For purposes of this analysis, we assume, without deciding, that the plaintiff is correct that, when article IV, § 10 (C), of the regulations applies to a legally nonconforming structure that has been damaged by flood or calamity, and the owner fails to start reconstruction within twelve months of the calamity, the building loses its legally nonconforming status.

Mayer-Wittmann *v.* Zoning Board of Appeals

months, the building retains its nonconforming status, and the owner is not required to conform the reconstructed building to current regulations or to seek variances from those regulations.

In the present case, the defendants contend that Breunich could not have reconstructed the sea cottage and used it "as before" because the cost of the repairs to the sea cottage exceeds 50 percent of its value and, therefore, the sea cottage is required to conform to the minimum flood elevation requirement of the regulations applicable to flood prone areas.[8] In other words, the defendants appear to contend that, notwithstanding article IV, § 10 (C), of the regulations, which authorizes landowners to reconstruct a damaged nonconforming building "as before" within twelve months of the calamity in which it was damaged, because the cost of repairs exceeds 50 percent of the sea cottage's value, the sea cottage is now categorically required to conform to the minimum flood elevation requirement. The plaintiff contends that, to the contrary, nothing in the regulations applicable to flood prone areas indicates that they are "preeminent among all the zoning regulations . . . ." Accordingly, the plaintiff contends, Breunich could have reconstructed the sea cottage "as before" pursuant to article IV, § 10 (C), of the regulations, if he had commenced construction within twelve months of the hurricane, and his failure to do so terminated the legally nonconforming status of the sea cottage in its entirety.

---

[8] See Stamford Zoning Regs., art. III, § 7.1 (B) (43) (2015) (for purposes of regulations governing flood prone areas, "[s]ubstantial [d]amage" is defined as "damage . . . sustained by a structure, whereby the cost of restoring the structure to its pre-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred"); id., art. III, § 7.1 (B) (44) (defining "[s]ubstantial [i]mprovement" to include repairs "the cumulative cost of which equals or exceeds [50] percent . . . of the market value" of structure); id., art. III, § 7.1 (D) (1) (requiring substantial improvements to comply with certain regulations governing flood prone areas); id. (requiring all substantial improvements within special flood hazard area to have lowest floor elevated to minimum elevation standard).

Mayer-Wittmann *v.* Zoning Board of Appeals

With respect to the defendants' contention that an owner of a damaged, legally nonconforming building must comply with the minimum flood elevation requirement when the cost of reconstructing the building exceeds 50 percent of the building's value, we agree that, unlike other regulations, such as those governing building height and setbacks, the minimum flood elevation requirement applies to the reconstruction of the damaged building under these circumstances. In other words, the building's legally nonconforming status *with respect to that requirement* was lost because the cost of repairs exceeds 50 percent of the building's value. Indeed, the requirement that a damaged building must be repaired in conformance with the minimum elevation requirement if the cost of repairs exceeds 50 percent of the value of the building can apply *only* to buildings that were in existence before the regulations applicable to flood prone areas were adopted, because buildings that were built and damaged *after* their adoption would already conform to the regulations, unless the owner obtained a variance.

In this regard, it is important to recognize that, unlike regulations governing setbacks, building height and property use, which are designed to address concerns that are largely aesthetic in nature, the minimum flood elevation requirements are intended to "promote the health, safety and welfare of the general public, [to] limit public and private property losses and diminish expenditures of public money for costly flood protection projects and relief efforts, and [to] minimize prolonged governmental and business interruptions." Stamford Zoning Regs., art. III, § 7.1 (A) (2015).

The authors of a white paper published by the Center for Energy & Environmental Law at the University of Connecticut School of Law aptly describe the scope of the problems that the zoning regulations applicable to flood prone areas were designed to address and the

Mayer-Wittmann *v.* Zoning Board of Appeals

crucial role that such regulations play. The white paper states that "[c]oastal flooding represents a tremendous threat to Connecticut infrastructure. The Federal Emergency Management Administration . . . estimates that a '100 year flood' in the four Connecticut [s]horeline counties could cause a staggering $3,571,200,000 in damage to residential structures alone. To further exacerbate this problem, climate scientists estimate that by 2100 the inundation levels of this 100 year flood will revisit the Connecticut coast once every seventeen years if greenhouse gas emissions continue at current rates.

"The National Flood Insurance Program . . . offsets some of the financial risk that these floods pose to homeowners. This program, administered by the Federal Emergency Management Agency . . . makes federal flood insurance available to communities that impose a minimum standard of floodplain management regulation, generally imposed through zoning ordinances. Every Connecticut municipality participates in the [program].

"Under the [program], participating municipalities *must* create land use ordinances that *require* habitable portions of new *or substantially improved* residential structures within the Special Flood Hazard Area to be elevated to or above the Base Flood Elevation . . . shown on Flood Insurance Rate Maps . . . . This elevation requirement is intended to minimize flood damage by keeping buildings above anticipated flood levels." (Emphasis added; footnotes omitted.) W. Rath et al., "Height Restrictions on Elevated Residential Buildings in Connecticut Coastal Floodplains," Municipal Resilience Planning Assistance Project: Law & Policy White Paper Series (2018) p. 2, available at https://circa.uconn.edu/wp-content/uploads/sites/1618/ 2018/03/Height-Restrictions-on-Elevated-Buildings.pdf (last visited October 30, 2019). At oral argument before

Mayer-Wittmann *v.* Zoning Board of Appeals

this court, counsel for the zoning board represented that the failure of a municipality to create such ordinances or to enforce them in a uniform manner could render not only the particular nonconforming property ineligible to participate in the National Flood Insurance Program, but also could render properties located throughout the entire municipality ineligible for the program. Thus, municipalities have a compelling interest in ensuring uniform compliance with such regulations.

We conclude, therefore, that, when a legally nonconforming building subject to the regulations applicable to flood prone areas is damaged and the cost of repairs exceeds 50 percent of the value of the building, the minimum flood elevation requirement applies to the repair of the building, notwithstanding the fact that the building previously had a legally nonconforming status with respect to that requirement, and notwithstanding article IV, § 10 (C), of the regulations, which authorizes the reconstruction "as before" of buildings damaged in a "calamity" within twelve months of the calamity.

Contrary to Breunich's apparent contention, however, conformance with the minimum flood elevation requirement is not categorically required under these circumstances. Rather, article III, § 7.1 (F), of the regulations, expressly authorizes the zoning board to issue variances from the regulations applicable to flood zone areas. Thus, the plaintiff is correct that Breunich potentially could have restored the sea cottage to its former state. He could have done so, however, only if he obtained a variance from the minimum flood elevation requirement.[9]

[9] Indeed, the plaintiff makes no claim to the contrary. In response to the defendants' argument that article IV, § 10 (C), of the regulations does not apply to the sea cottage because the building was required to conform to current regulations governing minimum flood elevation, the plaintiff states that the defendants are "accurate as far as [they go]. It is true that [the regulations governing] substantial improvements [in flood prone areas] . . . apply where the work to be done exceeds 50 percent of the structure's value." The plaintiff then contends that the defendants fail to recognize that

Mayer-Wittmann *v.* Zoning Board of Appeals

As we have indicated, the purpose of article IV, § 10 (C), of the regulations is to allow landowners to rebuild legally nonconforming buildings that have been damaged in a calamity *without* the need either to conform the building to the regulations or to seek a variance authorizing the nonconformity. We conclude, therefore, that article IV, § 10 (C), of the regulations does not apply to the sea cottage because it would have been impossible for Breunich to reconstruct the building "as before" without either conforming to the minimum elevation requirement or seeking a variance from the regulation. Indeed, the relatively short time frame referenced in the regulation clearly contemplates the situation in which the landowner will *not* be required either to completely redesign the building to conform to new regulations or to go through the lengthy administrative process for obtaining a variance from those regulations in order to secure a building permit.[10] See W. Rath et al., supra, p. 3 ("the variance process is time consuming and can be expensive as it requires an individual analysis, a detailed application, and a formal public hearing").

The plaintiff suggests, however, that the continued existence of a legally nonconforming structure and the need for variances are mutually exclusive concepts. In other words, if variances are required to authorize the construction or repair of a building to its former state, the building cannot be legally nonconforming. Accordingly, he contends that, if Breunich was required either to conform the sea cottage to the minimum elevation requirement of the regulations applicable to flood

_____

compliance with these regulations is not *categorically* required but may be subject to a variance.

[10] Indeed, to interpret article IV, §10 (C), of the regulations to apply to situations in which it would be virtually impossible for a landowner to begin repairs of a legally nonconforming building that was damaged in a calamity within twelve months of the damage would be of questionable constitutional validity because it would be confiscatory. See part II of this opinion.

Mayer-Wittmann *v.* Zoning Board of Appeals

prone areas or to seek a variance from that requirement, it necessarily follows that the sea cottage entirely lost its legally nonconforming status.

We disagree. As we explain in part II of this opinion, a regulation that entirely deprived a building of its legally nonconforming status might be confiscatory as applied and, as such, of questionable constitutionality.[11] It is well settled that "[t]his court has a duty to construe statutes, whenever possible, to avoid constitutional infirmities . . . ." (Internal quotation marks omitted.) *Honulik* v. *Greenwich*, 293 Conn. 641, 647, 980 A.2d 845 (2009); see also *Graff* v. *Zoning Board of Appeals*, supra, 277 Conn. 652 (interpretation of zoning regulations "is governed by the same principles that apply to the construction of statutes" [internal quotation marks omitted]). We conclude, therefore, that the purpose of the regulations prohibiting the reconstruction of a building that is nonconforming with the minimum flood elevation requirement to its previous state if the cost of repairs exceeds 50 percent of the value of the building was not to deprive legally nonconforming buildings entirely of their legally nonconforming status but to ensure the maximum possible compliance with the regulations applicable to flood prone areas. In other words, if a building is legally nonconforming with regulations such as setback requirements, and the building is damaged by flood or calamity, the fact that the building cannot be reconstructed without either complying with the minimum flood elevation requirement or obtaining a variance from that requirement or by obtaining a variance from the height restriction does not mean that the reconstructed building must also comply with all other regulations with which it was previously nonconforming. Accordingly, we conclude that the sea cottage retained its status as a legally nonconforming accessory

---

[11] But see footnote 13 of this opinion.

Mayer-Wittmann *v.* Zoning Board of Appeals

structure with respect to the setback and building height requirements of the regulations.

II

Having concluded that the legally nonconforming status of the sea cottage was not terminated by article IV, § 10 (C), of the regulations, we next address the plaintiff's claims that the zoning board improperly granted Breunich's application for variances because he did not establish a hardship and that, even if he did, the variances were not the minimum relief required to alleviate the hardship. We disagree.

"The standard of review on appeal from a zoning board's decision to grant or deny a variance is well established. We must determine whether the trial court correctly concluded that the board's act was not arbitrary, illegal or an abuse of discretion. . . . Courts are not to substitute their judgment for that of the board . . . and decisions of local boards will not be disturbed so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . Upon appeal, the trial court reviews the record before the board to determine whether it has acted fairly or with proper motives or upon valid reasons. . . . We, in turn, review the action of the trial court. . . . The burden of proof to demonstrate that the board acted improperly is upon the [plaintiff]." (Citations omitted; internal quotation marks omitted.) *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 205–206, 658 A.2d 559 (1995); see also *Richardson* v. *Zoning Commission*, 107 Conn. App. 36, 42, 944 A.2d 360 (2008) ("[t]rial courts defer to zoning boards and should not disturb their decisions so long as honest judgment has been reasonably and fairly exercised after a full hearing" [internal quotation marks omitted]). "Because the plaintiffs' appeal to the trial court is based solely on the record, the scope of the trial court's review of the board's decision and the scope of our review of that decision are the same." (Internal

Mayer-Wittmann *v.* Zoning Board of Appeals

quotation marks omitted.) *E & F Associates, LLC* v. *Zoning Board of Appeals*, 320 Conn. 9, 14, 127 A.3d 986 (2015).

"A variance constitutes permission to act in a manner that is otherwise prohibited under the zoning law of the town. . . . It is well established, however, that the granting of a variance must be reserved for unusual or exceptional circumstances. . . . An applicant for a variance must show that, because of some peculiar characteristic of his property, the strict application of the zoning regulation produces an unusual hardship, as opposed to the general impact which the regulation has on other properties in the zone. . . . Accordingly, we have [concluded that a zoning board of appeals may] grant a variance only when two basic requirements are satisfied: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan. . . . Proof of exceptional difficulty or unusual hardship is absolutely necessary as a condition precedent to the granting of a zoning variance." (Internal quotation marks omitted.) Id., 15. Zoning boards of appeals are authorized to grant variances in cases in which enforcement of a regulation would cause unusual hardship in order to "[furnish] elasticity in the application of regulatory measures so that they do not operate in an arbitrary or confiscatory and, consequently, unconstitutional . . . manner." *Florentine* v. *Darien*, 142 Conn. 415, 425, 115 A.2d 328 (1955).

In the present case, the plaintiff relies on our cases holding that "[d]isadvantage in property value or income, or both, to a single owner of property, resulting from application of zoning restrictions, does not, ordinarily, warrant relaxation in his favor on the ground of . . . unnecessary hardship. . . . Financial considerations are relevant only in those exceptional situations

Mayer-Wittmann *v.* Zoning Board of Appeals

where a board could reasonably find that *the application of the regulations to the property greatly decreases or practically destroys its value for any of the uses to which it could reasonably be put* and where the regulations, as applied, bear so little relationship to the purposes of zoning that, as to particular premises, the regulations have a confiscatory or arbitrary effect. . . . Zoning regulations have such an effect in the extreme situation where the application of the regulations renders the property in question practically worthless.'' (Citation omitted; emphasis added; internal quotation marks omitted.) *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 561–62, 916 A.2d 5 (2007); see also *E & F Associates, LLC* v. *Zoning Board of Appeals*, supra, 320 Conn. 20 (''when a property would have economic value even if the zoning regulations were strictly enforced, the fact that a peculiar characteristic of the property would make compliance with the zoning regulations exceptionally difficult if the property were put to a more valuable or desirable use does not constitute either an 'exceptional difficulty' or an unusual hardship''). The plaintiff contends that, if Breunich's application for variances is denied and he is unable to rebuild the sea cottage, he will still be able to use the four other dwelling units and various accessory structures that are located on the property, and, therefore, the strict enforcement of the setback and building height requirements of the zoning regulations would impose no unusual hardship.

In addressing the plaintiff's claim, however, it is important to keep in mind the legal principle underlying the general rule that enforcement of a regulation does not create an unusual hardship warranting a variance if the landowner retains a reasonable use of the property. That underlying principle is that land use regulation is constitutionally permissible as long as it does not amount to practical confiscation or inverse condemnation of a property, and a confiscation or inverse con-

Mayer-Wittmann *v.* Zoning Board of Appeals

demnation ordinarily does not occur unless the
landowner is deprived of any reasonable use of the
property. See *Rural Water Co.* v. *Zoning Board of
Appeals*, 287 Conn. 282, 298, 947 A.2d 944 (2008) (" '[a]n
ordinance which permanently restricts the use of land
for any reasonable purpose . . . goes beyond permissi-
ble regulation and amounts to practical confiscation' ");
id., 299 ("an inverse condemnation occurs when . . .
application of the regulation amounted to a practical
confiscation because the property cannot be used for
any reasonable purpose"). Thus, the tests for unusual
hardship and inverse condemnation are one and the
same. See *Barton* v. *Norwalk*, 326 Conn. 139, 148 n.6,
161 A.3d 1264 (2017) ("[t]he unusual hardship test in
zoning variance cases and the substantial destruction
test in inverse condemnation cases require a showing
that the property cannot be utilized for any reason-
able purpose").[12]

Just as a landowner has a constitutionally protected
right to use his property for *some* reasonable purpose,

---

[12] We do not suggest that establishing an inverse condemnation is the
*only* way to establish an unusual hardship. Our cases indicate that an unusual
hardship may also be established when the strict enforcement of a zoning
regulation to a particular property would contribute so little to the goals
that the regulation was intended to achieve that it would be arbitrary.
See *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 561 (hardship is
established "where the regulations, as applied, *bear so little relationship
to the purposes of zoning* that, as to particular premises, the regulations
have a confiscatory *or arbitrary* effect" [emphasis added; internal quotation
marks omitted]). It is clear, however, that an unusual hardship is established
if an inverse condemnation is established.

Although all members of this court agree that the trial court correctly
concluded that the variances were properly granted, there is disagreement
regarding the reasoning supporting that conclusion. Specifically, relying
heavily on treatises and cases from other jurisdictions, the concurrence
disagrees that the test for unusual hardship and the test for a regulatory
taking are the same, and contends that that is the case *only* when the
landowner claims that he will suffer a financial hardship if the zoning regula-
tion is strictly enforced. As we indicated, we would agree that a landowner
is not required to establish a financial loss rising to the level of a regulatory
taking in order to obtain a variance *if* the landowner can establish that the
enforcement of the zoning regulation would be arbitrary in the sense that
it would not contribute meaningfully to the goals that the regulation was

Mayer-Wittmann *v.* Zoning Board of Appeals

however; see *Rural Water Co.* v. *Zoning Board of Appeals*, supra, 287 Conn. 299; a landowner has a constitutionally protected property right to the *continued* use of an existing, legally nonconforming building. See *Petruzzi* v. *Zoning Board of Appeals*, 176 Conn. 479, 484, 408 A.2d 243 (1979) (" '[a] lawfully established nonconforming use is a vested right and is entitled to constitutional protection' "). Accordingly, the deprivation of that right by regulation would also constitute an inverse condemnation, notwithstanding the fact that the landowner could still use the property for some *other* permitted or legally nonconforming purpose.[13]

intended to achieve. That is not the case here, however. Increasing the height of the sea cottage to 27.9 feet, which is 12.9 feet above the maximum allowed height of fifteen feet, will block the views of neighboring properties, which is precisely what the maximum height regulation was intended to prevent. Moreover, if the concurrence were correct that the sea cottage lost its legally nonconforming status because it was more than 50 percent destroyed—which we conclude that it did not; see footnote 13 of this opinion; Breunich would be required to seek variances from *all* of the regulations with which the sea cottage was nonconforming before its destruction, not just those regulations with which the sea cottage is now even more nonconforming. Thus, Breunich would be required to obtain a variance from article III, § 4 (AA) (2.2), of the regulations, which permits only one single family detached dwelling per lot, so that he could maintain three dwelling structures with a total of five dwelling units on the property, as well as two sheds and a garage. Such a variance would clearly increase the population density of the zone, which is precisely what the regulation is intended to prevent.

To the extent that the concurrence suggests that there are considerations *other than* financial loss that can give rise to an unusual hardship warranting a variance, even when granting the variance would have a negative impact on the goals of the zoning scheme, it is entirely unclear to us what those considerations might be or why the concurrence believes that they justify the granting of the variance in the present case. Moreover, the concurrence has not cited any authority for the proposition that a property owner's loss of the right to use the property in a particular manner has ever been considered anything other than a reduction in the *value* of the property—in other words, a financial loss—for zoning purposes in this state.

[13] Although the plaintiff makes no claim that Breunich is prohibited from rebuilding the sea cottage pursuant to article IV, § 10 (B), of the Stamford Zoning Regulations, which provides that "[t]he total structural repairs and alterations that may be made in a structure which is nonconforming in use only shall not exceed [50] percent . . . of its replacement value at the time of application for the first structural change, unless changed to a conforming use"; see footnote 5 of this opinion; there is authority for the proposition that such regulations are constitutional because the destruction of more

Mayer-Wittmann *v.* Zoning Board of Appeals

than 50 percent of the value of a nonconforming building or a building with a nonconforming use can deprive the owner of his vested right to continue using the property for that purpose. See *State* v. *Hillman*, 110 Conn. 92, 107, 147 A. 294 (1929) (regulation that prohibited reconstruction of nonconforming building when more than 50 percent of building is destroyed was constitutional as applied). The court in *Hillman* observed that "[t]he police power has its limitations in the extent of the taking or the diminution of the value of property affected. When it reaches a certain magnitude, in most if not all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts." (Internal quotation marks omitted.) Id., 106; see also *Bobandal Realties*, *Inc.* v. *Worthington*, 21 App. Div. 2d 784, 785–86, 250 N.Y.S.2d 575 (1964) ("Ordinances using 50 [percent] of value or assessed value as a criterion in determining whether an owner shall be permitted to reconstruct a partly destroyed nonconforming building have been held not unreasonable on their face . . . . The question whether an ordinance using 50 [percent] of [value] as a criterion is unreasonable and confiscatory should not be decided in a vacuum, but only with relation to a specific case in which facts have been presented to show that *in that case* the application of such criterion would destroy so great a part of the value of the nonconforming property that it would be unreasonable and confiscatory . . . ." [Citations omitted; emphasis in original; internal quotation marks omitted.]), aff'd, 15 N.Y.2d 788, 205 N.E.2d 685, 257 N.Y.S.2d 588 (1965). We note that the court in *Hillman* concluded that enforcing the regulation at issue in that case did not have a confiscatory effect after noting that there was no evidence that there would be a significant "diminution in value of the property . . . ." *State* v. *Hillman*, supra, 107. Presumably, this was because the defendant landowner could construct a conforming building on the property. Contrary to the concurrence's suggestion, we do not conclude that *Hillman* did not involve the casualty doctrine. See footnote 5 of the concurring opinion. Rather, we conclude that, under the casualty doctrine, the courts must consider the specific facts of the case in determining whether a zoning regulation that prohibits the reconstruction of a nonconforming building that has been destroyed is constitutional as applied.

In the present case, we find the following circumstances to be relevant. First, article IV, § 10 (C), of the regulations expressly allows the owner of a nonconforming building that has been completely destroyed in a calamity to reconstruct the building and use it as before. The record supports the conclusion that Breunich would have taken advantage of that regulation but for the fact that the regulations applicable to flood prone areas prohibited him from doing so. Thus, if article IV, § 10 (B), of the regulations were applied to the sea cottage, the minimum flood elevation requirement would have the effect of depriving Breunich of the clear right to rebuild the sea cottage that he otherwise would have enjoyed. Cf. *Piccolo* v. *West Haven*, 120 Conn. 449, 453–54, 455–56, 181 A. 615 (1935) (when owners of nonconforming building that had been destroyed by fire sought variance to replace destroyed building with building that would have increased nonconformities, and owners could have reconstructed original building within one year under town regulations, variance was not warranted because any hardship was caused by owners' own failure to reconstruct original building within one year).

333 Conn. 624      NOVEMBER, 2019      645

Mayer-Wittmann *v.* Zoning Board of Appeals

Second, the record supports the conclusion that, in light of the governing regulatory requirements, the need to redesign the sea cottage to conform to those requirements, and the need to obtain variances, Breunich proceeded as expeditiously as reasonably possible to take steps to rebuild the sea cottage. Finally, unlike in *Hillman*, there is no evidence in the present case that Breunich would be able to construct a conforming structure of some type on the property if the variances were denied, and he would therefore lose the *entire* value of the sea cottage. We recognize that there is authority for the proposition that, when a property contains multiple structures, and a nonconforming structure is more than 50 percent destroyed, prohibiting the rebuilding of the structure may not be confiscatory under certain circumstances because the landowner still has a reasonable use of the property. See *State ex rel. Covenant Harbor Bible Camp* v. *Steinke*, 7 Wis. 2d 275, 283, 96 N.W.2d 356 (1959) (as applied to destroyed nonconforming building on property containing multiple buildings, 50 percent rule may be reasonable if building contained separate use, but may not be reasonable if building was "used jointly with other buildings in a single [nonconforming] use upon one premises"). In our view, however, it would make no sense to conclude that it is confiscatory to prohibit the reconstruction of a destroyed nonconforming building when the building is the only building on the property and it cannot be replaced by a conforming building, but if an identical building on a property containing multiple buildings is destroyed and cannot be replaced, reconstruction can constitutionally be prohibited. The loss is the same in both cases. We conclude that, under these specific circumstances it would be confiscatory to prohibit Breunich from rebuilding the sea cottage pursuant to article IV, § 10 (B), of the regulations.

The concurrence disagrees with this analysis and, again relying on treatises and case law from another state, contends that this court should consider *only* the extent to which a nonconforming building has been destroyed in determining whether the owner continues to have the right to use the property for that purpose, and whether the landowner can replace the nonconforming building with a conforming building is irrelevant. *This* court expressly recognized in *Hillman*, however, that, when a nonconforming structure has been destroyed, whether the application of a zoning regulation that prevents the rebuilding of the structure would be constitutional "depends upon the particular facts" of the case. (Internal quotation marks omitted.) *State* v. *Hillman*, supra, 110 Conn. 106. This court in *Hillman* found it significant that there was no evidence in that case that prohibiting the defendant landowner from rebuilding the destroyed nonconforming buildings, which had been used in connection with the business of "storing, washing, repairing, burning, and steaming barrels of various kinds and descriptions which had contained commodities such as fish, lard, crisco, oil, cider, pork, etc."; id., 96–98 (preliminary statement of facts and procedural history); would cause a significant "diminution in value of the property"; id., 107; presumably because the defendant could replace the destroyed buildings with a conforming building or buildings of comparable value.

The concurrence also contends that prohibiting Breunich from rebuilding the sea cottage would not be unconstitutional because Breunich can still use his property for other purposes. In support of this contention, the

Mayer-Wittmann *v.* Zoning Board of Appeals

The decision of the Commonwealth Court of Pennsylvania in *Jenkintown Towing Service* v. *Zoning Hearing Board*, 67 Pa. Commw. 183, 446 A.2d 716 (1982), is instructive on this issue. The court in that case noted that, although "hardship clearly consists of the virtual unusability of the land in its entirety for any permitted use" if the regulations were strictly enforced and the applicant has sought a variance in order to *bring into being* a nonconforming use or building, in cases involving *existing legally nonconforming uses or structures*, "the land . . . *already has utility*." (Emphasis added.) Id., 192. The court then observed

concurrence cites *Murr* v. *Wisconsin*,      U.S.     , 137 S. Ct. 1933, 198 L. Ed. 2d 497 (2017), for the proposition that the "test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property . . . ." (Internal quotation marks omitted.) Id., 1943–44. The court in *Murr*, however, was not addressing the problem that is before this court, namely, whether prohibiting the rebuilding of a nonconforming building that has been destroyed violates the constitution when the landowner cannot replace the building with another structure that is conforming. Rather, the court was addressing the question of whether it should treat adjacent parcels of land that are owned by the same landowner as a single parcel or as distinct parcels in determining whether a taking has occurred. See id., 1941. The court declined to adopt a categorical answer to that question but repeatedly emphasized that "[a] central dynamic of the [c]ourt's regulatory takings jurisprudence . . . is its flexibility"; id., 1943; and that "courts must consider a number of factors" on a case-by-case basis when identifying the property that was taken by regulation and the property that remains. Id., 1945. Thus, *Murr* is not inconsistent with *Hillman*. We therefore conclude that, when a nonconforming structure has been destroyed and a regulation prohibits the rebuilding of the structure, the difference between the value that was taken from the property, i.e., the value of the destroyed nonconforming structure, and the value that remains, i.e., the value of the structure, if any, that the landowner can build to replace the destroyed structure, is a factor that the courts may consider in determining whether the strict enforcement of the regulation would have a confiscatory effect.

The concurrence insists that, in making the determination as to whether a taking has occurred, the only consideration is whether "the property," i.e., the legally defined parcel of land on which a structure stood, still has value. See footnote 5 of the concurring opinion. *Murr* makes clear, however, that, for purposes of takings jurisprudence, the meaning of the term "the property" is flexible. See *Murr* v. *Wisconsin*, supra, 137 S. Ct. 1943.

Mayer-Wittmann *v.* Zoning Board of Appeals

that, "because any zoning ordinance provision is subject
to the grant of a variance in a proper case . . . such
restrictions must bow if adhering to them *would
threaten the continued existence of the* [*preexisting*]
*use* [*or structure*] *itself.*" (Emphasis added.) Id., 193.
As we have explained, this is because such regulations
would amount to an inverse condemnation of the land-
owner's vested property right in the existing, legally
nonconforming use or structure, even if the landowner
could use the property for some other reasonable
purpose.

None of the cases that the plaintiff cites in support
of his claim that Breunich was required to establish
that he could not use his property for any reasonable
purpose if the regulations were strictly enforced
involves an application for a variance in order to allow
the continuation of an existing, legally nonconforming
use or structure. Rather, in each case that he cites in
which a variance was found not to be warranted, the
applicant sought either to construct a new nonconform-
ing structure or to expand an existing nonconforming
structure. *See E & F Associates, LLC* v. *Zoning Board
of Appeals*, supra, 320 Conn. 12 (applicant sought to
expand nonconforming building by adding second
story); *Moon* v. *Zoning Board of Appeals*, 291 Conn.
16, 18, 966 A.2d 722 (2009) (applicants sought to add
additional living space to second story of nonconform-
ing building); *Francini v. Zoning Board of Appeals*, 228
Conn. 785, 787, 639 A.2d 519 (1994) (applicant sought to
build residence on nonconforming lot); *Hyatt* v. *Zoning
Board of Appeals*, 163 Conn. 379, 381, 311 A.2d 77 (1972)
(applicant sought to build second nonconforming build-
ing); *Verrillo* v. *Zoning Board of Appeals*, 155 Conn.
App. 657, 664, 111 A.3d 473 (2015) (applicant sought to
expand existing nonconforming building); *Horace* v.
*Zoning Board of Appeals*, 85 Conn. App. 162, 164, 855
A.2d 1044 (2004) (applicant sought to expand existing

nonconforming use); *Munroe* v. *Zoning Board of Appeals*, 75 Conn. App. 796, 798, 818 A.2d 72 (2003) (applicant sought to add second story to existing nonconforming building). In the present case, although conforming the sea cottage to the minimum flood elevation requirement will increase its nonconformity with the regulations governing building height, in contrast to these cases, Breunich is not seeking to "expand" the nonconforming building for his own personal benefit or convenience but is seeking the variances in order to comply with the minimum flood elevation requirement of the regulations applicable to flood prone areas, which is intended to reduce the safety and financial hazards that nonconforming structures present both to landowners and to the general public in the event of a flood. As we explained, the sea cottage is required to conform to that requirement even though the building previously was legally nonconforming. In the absence of either a variance from the building height regulations or the minimum flood elevation requirement, the sea cottage cannot be rebuilt. Thus, the underlying purpose of the variances is not to "expand" the nonconformities of the sea cottage but merely to allow its continued use. Accordingly, we find the cases that the plaintiff cites to be inapposite.

On the basis of the foregoing, we conclude that the zoning board reasonably found that Breunich established the existence of an unusual hardship warranting approval of his application for variances because the strict enforcement of the regulations would have deprived him of his constitutionally protected right to continue using the sea cottage, which is an existing, legally nonconforming accessory structure. As we explained, without variances in some form, Breunich simply would be unable to reconstruct the sea cottage, resulting in an inverse condemnation of his existing, legally nonconforming use. In other words, it would

Mayer-Wittmann *v.* Zoning Board of Appeals

result in an unusual hardship. Such a result is precisely what the zoning board's authority to grant variances was designed to circumvent. See *Florentine* v. *Darien,* supra, 142 Conn. 425 (power to grant variances is intended to "[furnish] elasticity in the application of regulatory measures so that they do not operate in an arbitrary or confiscatory and, consequently unconstitutional . . . manner").

To the extent that the plaintiff contends that it was improper for the zoning board to have granted the variances from the regulations governing building height and setbacks because those variances would have been unnecessary if Breunich had sought a variance from the minimum flood elevation requirement, we disagree. First, considered in light of the compelling public interests that the minimum flood elevation requirement is intended to protect, nothing in the record indicates that conforming the sea cottage to that requirement would entail an unusual hardship, thereby warranting a variance.[14] Second, the plaintiff has cited no authority for

[14] To the extent that it might be claimed that the fact that the soils under the sea cottage would not support the elevated structure would constitute an unusual hardship justifying such a variance, the response to that claim is that that any such hardship could be alleviated merely by moving the sea cottage three feet north.

To the extent that the plaintiff contends that, by submitting a request to move the footprint of the sea cottage three feet north, thereby necessitating the variance from the setback requirements, Breunich lost his constitutionally protected right to continue to use the sea cottage as a legally nonconforming building, we disagree. It is well settled that a variance may be granted to continue a nonconforming use if the variance will reduce the nonconformity of the building or use. See *Vine* v. *Zoning Board of Appeals,* supra, 281 Conn. 562 ("the reduction of a nonconforming use to a less offensive prohibited use may constitute an independent ground for granting a variance"). The only effect of moving the sea cottage would be to reduce the rear yard setback nonconformity. Accordingly, we can see no reason why, if the zoning board would have been warranted in granting a variance to the regulation governing building height to accommodate the minimum flood elevation requirement if it had been possible to elevate the sea cottage in its current location, it was barred from granting the application for variances because the sea cottage had to be moved three feet, thereby *reducing* its nonconformity.

Mayer-Wittmann *v.* Zoning Board of Appeals

the proposition that a zoning board of appeals cannot grant a variance from one regulation if granting a variance from another regulation would make the variance from the first regulation unnecessary.

The plaintiff also claims that, to establish an unusual hardship, Breunich was required to show that the hardship arose from some unique or peculiar characteristic of his property. See, e.g., *Moon* v. *Zoning Board of Appeals*, supra, 291 Conn. 24 ("[a]n applicant for a variance must show that, *because of some peculiar characteristic of his property*, the strict application of the zoning regulation produces an unusual hardship, as opposed to the general impact which the regulation has on other properties in the zone" [emphasis added; internal quotation marks omitted]); *Francini* v. *Zoning Board of Appeals*, supra, 228 Conn. 791 ("[i]t is well settled that the hardship must be different in kind from that generally affecting properties in the same zoning district" [internal quotation marks omitted]); *Plumb* v. *Board of Zoning Appeals*, 141 Conn. 595, 600, 108 A.2d 899 (1954) ("[t]he hardship must be one different in kind from that imposed upon properties in general by the ordinance"). The plaintiff contends that the sea cottage has no such unique or peculiar characteristic, but, to the contrary, its characteristics making full compliance with all zoning regulations difficult are shared by "numerous coastal properties in Stamford," many of which were also damaged by Hurricane Sandy.[15] Even

[15] The authors of the white paper prepared by the Center for Energy & Environmental Law at the University of Connecticut School of Law have observed that applicants seeking variances from zoning regulations governing building height in order to conform to the minimum flood elevation requirement must "demonstrate that the variance is required because of some peculiar characteristic of the property. [This] can be [a] difficult [requirement] to meet when the applicant is one of many similarly situated floodplain property owners." W. Rath et al., supra, p. 3. The authors also note that height restrictions on buildings have the effect of "squeezing [such] property owners between two different regulatory requirements." Id.

Mayer-Wittmann *v.* Zoning Board of Appeals

if we were to assume, however, that there is nothing unique or peculiar about Breunich's property that renders the strict application of the regulations unusually harsh, and that the problems that he faces in reconstructing the sea cottage are shared by many other owners of damaged buildings in flood prone areas, it would then follow that the strict enforcement of the regulations would also threaten to confiscate the other damaged buildings and structures that, before being damaged, were legally nonconforming with the minimum flood elevation requirements.[16] The plaintiff has cited no authority for the proposition that a variance from a regulation may not be granted to a particular landowner if the regulation has a confiscatory effect not only on his property, but also on other existing, legally nonconforming buildings and structures, because the hardship does not arise from a peculiar or unique characteristic of the landowner's property.[17] An

[16] The concurrence would conclude that the sea cottage is unique because it was "a nonconforming accessory structure located in a highly restrictive flood zone subject to the mandatory flood regulations." The plaintiff's point, however, is that many of the buildings that were destroyed by Hurricane Sandy cannot be rebuilt to conform to the flood regulations without obtaining a variance from building height restrictions. See W. Rath et al., supra, app. A, p. 7, quoting Stamford Zoning Regs., art. III, § 3 (A) (16) (b) (2016) (when primary residence is reconstructed to comply with minimum elevation standards, maximum height of new building may be only up to five feet higher than height allowed by zoning regulations). Accordingly, we fail to perceive how the sea cottage was unique. To the extent that the concurrence contends that the plaintiff's situation is different because the sea cottage was an *accessory structure*, and, therefore, in contrast to the application of a regulatory prohibition on rebuilding to primary residences that cannot be rebuilt without obtaining a variance, the application of such a regulation to the sea cottage does not constitute a taking; see footnote 13 of this opinion; the concurrence appears to admit through the back door what it refuses to admit through the front door, namely, the principle that a regulation that prohibits the reconstruction of a nonconforming building that has been destroyed creates a hardship if the building cannot be replaced with a conforming building, notwithstanding the fact that the parcel of property on which the structure was located still has value.

[17] We note parenthetically that we are somewhat puzzled by the line of cases holding that a variance is not warranted if the subject property does

Mayer-Wittmann *v.* Zoning Board of Appeals

unconstitutional confiscation of property by regulation does not become constitutional merely because the regulation affects other properties in the same way. Accordingly, we reject this claim.

Finally, we address the plaintiff's claim that the zoning board improperly granted Breunich's application for variances because the variances were not the minimum relief required to alleviate the hardship. See, e.g., *L & G Associates, Inc.* v. *Zoning Board of Appeals*, 40 Conn. App. 784, 788, 673 A.2d 1146 (1996) ("[b]ecause a variance affords relief from the literal enforcement of a zoning ordinance, it will be strictly construed to limit relief to the minimum variance which is sufficient to relieve the hardship" [internal quotation marks omitted]). The plaintiff contends that the setback variances that Breunich requested were not the minimum necessary to alleviate any hardship because he could conform the sea cottage to all of the setback requirements by moving it west five and one-half feet and north ten feet. In support of this claim, the plaintiff cites *Green Falls Associates, LLC* v. *Zoning Board of Appeals*, 138 Conn.

not have a unique or peculiar characteristic that renders the strict application of the zoning regulations unusually harsh. We have held that the fact that a property *does* have such a unique or peculiar characteristic, standing alone, does not justify the granting of a variance in the absence of proof that the regulation is confiscatory. See *E & F Associates, LLC* v. *Zoning Board of Appeals*, supra, 320 Conn. 20 ("when a property would have economic value even if the zoning regulations were strictly enforced, the fact that a peculiar characteristic of the property would make compliance with the zoning regulations exceptionally difficult if the property were put to a more valuable or desirable use does not constitute either an 'exceptional difficulty' or an unusual hardship"). On the other hand, it is clear to us that, if a regulation has a confiscatory effect on a property, it does not follow from the fact that that effect does *not* arise from a unique characteristic of the particular property that no hardship warranting a variance exists. Accordingly, it would appear to us that the question of whether the regulation has a confiscatory effect is dispositive, and it is unclear to us how the unique characteristics of a particular property come into play when determining whether an unusual hardship exists. Because this question is not before us, however, we leave it for another day.

Mayer-Wittmann *v.* Zoning Board of Appeals

App. 481, 484, 53 A.3d 273 (2012) (applicant sought
to build new single-family residence on lot), *Jaser* v.
*Zoning Board of Appeals*, 43 Conn. App. 545, 546, 684
A.2d 735 (1996) (applicants sought to construct new
single-family residence on lot), and *L & G Associates,
Inc.* v. *Zoning Board of Appeals*, supra, 786 (applicant
sought to construct new office building on property).
All of these cases, however, involved applications for
variances to build new nonconforming buildings.[18] As

---

[18] The plaintiff also cites *Hescock* v. *Zoning Board of Appeals*, 112 Conn.
App. 239, 962 A.2d 177 (2009), in support of the proposition that the require-
ment that a variance provide only the minimal relief required to alleviate
the hardship also applies to variances that will reduce the nonconformity
of an existing nonconforming building. His reliance on this case, however,
is misplaced. In *Hescock*, the defendant landowners owned a legally noncon-
forming house that was damaged in a hurricane and that no longer complied
with various building and habitability codes and requirements. See id., 252.
The house was located 44 feet landward of the mean high tide, in legal
nonconformance with a zoning regulation requiring a minimum distance of
100 feet. See id., 242. The landowners wanted to build a new house that
would be located 47 feet landward of the mean high tide and sought a
variance to authorize that nonconformity. See id. The Appellate Court
rejected the plaintiffs' contention that the defendant zoning board of appeals
had failed to consider a zoning regulation requiring that "the granted variance
be minimal" on the ground that the board had considered the fact that "the
new house would be as far from the water as possible" given the configura-
tion of the lot when it granted the variance. Id., 255. In addressing the
plaintiffs' contention that no hardship had been established, the Appellate
Court observed that a reduction in nonconformity can also justify a variance,
and concluded that the new house would reduce the existing nonconformi-
ties because it would be further from the water than the damaged house
and it would eliminate nonconformance with all of the other flood zone
regulations. See id., 260–61. In the present case, the plaintiff relies on the
Appellate Court's conclusion that the variance was the minimum relief
required because "the new house would be as far from the water as possible";
id., 255; to support his claim that the zoning board could not grant the
variances unless Breunich established that he was reducing all of the sea
cottage's nonconformities to the maximum extent possible. The Appellate
Court in *Hescock*, however, did not clearly distinguish the variance principles
that apply to *new construction* from the principles that apply to *legally
nonconforming buildings*. Indeed, the court did not cite any cases at all
in support of the proposition that the landowners were required to establish
that the variance was the "minimum necessary" to relieve hardship. Rather,
the court appears to have assumed in that portion of its decision that the

we indicated, the sea cottage is an *existing*, legally nonconforming building, and the setback variances that Breunich sought and that the zoning board granted will allow the building to be moved to a *less* nonconforming location. See footnote 14 of this opinion. The plaintiff has cited no authority that convincingly supports the proposition that, when an applicant seeks a variance that will have the effect of reducing a nonconformity of an *existing*, legally nonconforming building, the variance may not be granted unless the applicant reduces *all* of the building's nonconformities to the maximum extent possible. Indeed, it would make little sense to bar landowners from seeking a variance to reduce a nonconformity of an existing building unless they reduced that conformity—as well as all other nonconformities—to the maximum extent possible.[19] Presumably, *any* reduction in nonconformity could only benefit the zoning scheme. We therefore reject this claim.

For the foregoing reasons, we conclude that the trial court correctly determined that the zoning board properly granted Breunich's application for variances from the regulations and, therefore, properly dismissed the plaintiff's appeal.

The judgment is affirmed.

In this opinion D'AURIA, MULLINS and KAHN, Js., concurred.

_____

application for a variance was for "new construction"; id., 254; and not for the repair or modification of an existing, legally nonconforming building. In contrast, in the portion of its decision addressing the plaintiffs' claim that no hardship existed, the court clearly assumed that the landowners were continuing the use of a legally nonconforming building. See id., 261 ("the new construction would reduce and eliminate existing nonconformities"). Accordingly, *Hescock* provides little guidance in the present case.

[19] We recognize, of course, that, if a landowner sought a variance to *increase* the nonconformity of an existing, legally nonconforming building, the landowner would be required to establish that the variance was the minimum relief necessary to alleviate the hardship.

Mayer-Wittmann *v.* Zoning Board of Appeals

ECKER, J., with whom ROBINSON, C. J., joins, concurring in the judgment. Although I agree with the disposition of this appeal, I write separately because I do not agree with substantial aspects of the legal analysis employed by the majority opinion to reach that result. More specifically, I disagree with the constitutional point raised in the final paragraph of part I of the majority opinion, and I further disagree with that portion of part II of the majority opinion suggesting that the issuance of the variances to the defendant Paul E. Breunich was in any way constitutionally compelled such that the denial of the application would have amounted to a practical confiscation or inverse condemnation of his property. I instead would affirm the judgment of the trial court dismissing the appeal of the plaintiff, Karl Mayer-Wittmann, executor of the estate of Gerda Mayer-Wittmann, on the ground that the named defendant, the Zoning Board of Appeals of the City of Stamford (zoning board), did not abuse its discretion when it granted the variances on the basis of its finding that the natural event that severely damaged Breunich's sea cottage, combined with the mandatory flood regulations imposed by the city of Stamford and the Federal Emergency Management Agency (FEMA), combined to create an unusual hardship. I therefore concur in the judgment.

I

My disagreement with the majority arises at two different points in its opinion. First, in the final portion of part I of its opinion, the majority refers to constitutional concerns that would arise were the court to hold that the sea cottage automatically lost its legally nonconforming status either by operation of article IV, § 10 (C), of the Zoning Regulations of the city of Stamford

Mayer-Wittmann *v.* Zoning Board of Appeals

(regulations),[1] or because Breunich was required to obtain variances before the zoning board could authorize reconstruction of the sea cottage.[2] Second, and more prominently, part II of the majority opinion holds that "Breunich established the existence of an unusual hardship warranting approval of his application for variances *because the strict enforcement of the regulations would have deprived him of his constitutionally protected right to continue using the sea cottage*, which is an existing, legally nonconforming accessory structure. . . . [W]*ithout variances in some form, Breunich simply would be unable to reconstruct the sea cottage, resulting in an inverse condemnation of his existing, legally nonconforming use.* In other words, it would result in an unusual hardship." (Emphasis added.)

I cannot agree with the majority's constitutional analysis. Indeed, I understand the applicable law, hereinafter referred to as the "casualty doctrine," to say exactly the opposite, namely, that a landowner generally has *no* constitutional right to rebuild a legally nonconforming structure that has been substantially destroyed by fire, flood, or some other comparable force majeure.[3] See generally D. Gross, annot., "Zoning:

[1] Article IV, § 10 (C), of the Stamford Zoning Regulations provides in relevant part that "[a]ny non-conforming building . . . which has been or may be damaged by . . . flood . . . [or] act of God . . . may be reconstructed and used as before, if reconstruction is started with[in] twelve . . . months of such calamity . . . ."

[2] Invoking the canon of constitutional avoidance in statutory construction, the majority rejects the plaintiff's absolutist construction of the applicable regulations on the ground that "a regulation that entirely deprived a building of its legally nonconforming status might be confiscatory as applied and, as such, of questionable constitutionality."

[3] It is undisputed in the present case that the sea cottage sustained damage exceeding 50 percent of its value, which triggers application of the relevant flood zone elevation requirements to restoration of the structure notwithstanding its legally nonconforming status. The majority also correctly notes that article IV, § 10 (B), of the Stamford Zoning Regulations states in relevant part: "The total structural repairs and alterations that may be made in a structure which is non-conforming in use only shall not exceed [50] percent

Mayer-Wittmann *v.* Zoning Board of Appeals

Right to Repair or Reconstruct Building Operating as Nonconforming Use, After Damage or Destruction by Fire or Other Casualty,'' 57 A.L.R.3d 419 (1974 and Supp. 2018) (collecting extensive case law from across the country, including Connecticut); 4 E. Ziegler, Rathkopf's The Law of Zoning and Planning (2011) § 74:11, pp. 74-38 through 74-42 (citing cases). The casualty doctrine is no stranger to Connecticut; one of the early cases articulating the doctrine, still cited in modern cases and treatises on the subject, was decided by this very court. See *State* v. *Hillman*, 110 Conn. 92, 107, 147 A. 294 (1929) (rejecting landowner's constitutional attack on zoning regulation that prohibited restoration of legally nonconforming building if more than 50 percent of its assessed value was destroyed by fire). Yet another Connecticut case lends indirect but significant support to the same point by affirming a zoning board's decision denying the landowners' petition for permission to rebuild a legally nonconforming structure that had been destroyed by fire. See *Piccolo* v. *West Haven*, 120 Conn. 449, 455, 181 A. 615 (1935).

This court's decision in *Hillman* provides an early but nonetheless representative illustration of the casualty doctrine at work. Indeed, it continues to be cited as a seminal case on the subject.[4] The defendant, Isaac Hillman, was a corporate officer of an industrial company that operated within the city of Bridgeport prior to the enactment of zoning regulations in 1925, and then continued to operate as a preexisting nonconforming use after the zoning regulations were adopted. *State* v. *Hillman*, supra, 110 Conn. 94–98 (preliminary statement of facts and procedural history). The next year,

. . . of its replacement value at the time of the application for the first structural change, unless changed to a conforming use. . . .''

[4] See, e.g., 6 N. Williams & J. Taylor, American Land Planning Law (Rev. Ed. 2019) § 122:2 (describing *Hillman* as ''the first zoning case in Connecticut'' and noting that ''the opinion specifically approved a prohibition against rebuilding a nonconforming establishment'' substantially destroyed by fire).

Mayer-Wittmann *v.* Zoning Board of Appeals

a fire destroyed numerous company buildings neces-
sary for the operation of the business, and the company
sought to rebuild. The company's application to recon-
struct the damaged buildings was denied by the city,
however, pursuant to a regulation prohibiting recon-
struction of a nonconforming building that is damaged
by fire in an amount exceeding 50 percent of the build-
ing's value. Id., 98–99 (preliminary statement of facts
and procedural history). Hillman was convicted of vio-
lating the city's zoning laws after the company failed
to relocate and instead continued to operate from its
original location using temporarily repaired buildings.
Id., 99 (preliminary statement of facts and procedural
history). This court rejected the defendant's claim that
the operative zoning regulations were unconstitutional
"in that they purport to deprive this company and this
defendant of his property without just compensation."
Id., 105. The court's constitutional analysis concludes
that "we are unable to hold that when over [50 percent]
of [the company's] buildings are destroyed it was not
a fair exercise of the police power to refuse to permit
the company to restore the burned building and con-
tinue the nuisance in [the newly zoned district]." Id.,
107.[5]

---

[5] The majority suggests that the casualty doctrine is not operative in
*Hillman* and contends that the case instead supports the view that a munici-
pality may prohibit the restoration of a preexisting nonconforming structure
only if the landowner is able to replace the structure with a conforming
building or buildings of comparable value. I read *Hillman* very differently,
as do the treatises cited in part I of this concurring opinion. First and
foremost, *Hillman* is a case about loss causation, and it remains an important
precedent in that context because it is among the first judicial opinions in
the country to articulate the rule that the government acts within constitu-
tional limits when it refuses to permit the restoration of a nonconforming
building substantially destroyed by fire. See W. Horton & B. Levesque,
"The Wheeler Court," 24 Quinnipiac L. Rev. 301, 329 (2006) (stating that
"Connecticut was leading the country" when *Hillman* "sustained a [zoning]
regulation prohibiting the rebuilding of a nonconforming factory after a fire
destroyed over half the value of the buildings"). Second, in *Hillman*, the
constitutional analysis did not turn on the landowner's ability vel non to
replace or rebuild the destroyed *buildings*. If the loss to the nonconforming

333 Conn. 624 NOVEMBER, 2019 659

Mayer-Wittmann *v.* Zoning Board of Appeals

As previously noted, the case law from across the country is consistent with our decision in *Hillman* as it relates to the casualty doctrine. The Rathkopf treatise characterizes as "customary" zoning regulations terminating a legal nonconformity in the event of a casualty causing substantial destruction of the nonconforming structure, and describes the underlying logic of such regulations as follows: "In conformity with the philosophy that the spirit of zoning is to restrict, rather than increase, nonconforming uses and to eliminate such uses as speedily as possible, and in order to discourage the reestablishment of nonconforming uses, the investment value of which has been lost to the owner through accident and through no action on the part of the municipality, *it is customary to provide in zoning ordinances a prohibition against the replacement of a nonconforming structure or one employed in a nonconforming use in excess of a specified percentage, this percentage being fixed as equivalent to substantial destruction.*" (Emphasis added.) 4 E. Ziegler, supra, § 74:11, p. 74-38.[6]

---

*building* is substantial enough to trigger application of the regulation prohibiting reconstruction, then the constitutional analysis examines the loss in value to the *property* to determine whether a taking has occurred. This point explains why the court in *Hillman* observed that "[t]here is nothing in the [trial court's] finding showing *the extent of the diminution in value of the property or the business*; it may be that these were small in extent." (Emphasis added.) *State* v. *Hillman*, supra, 110 Conn. 107. Applying this observation to the present case, it is clear that Breunich's *property* retains most of its value even without the sea cottage. *Hillman* thus demonstrates that Breunich would have no plausible constitutional claim if the municipal defendants had denied his application.

[6] There are cases to the contrary, but the Rathkopf treatise explains that the exceptions typically involve jurisdictions in which "the zoning enabling act specifies the extent to which municipalities may restrict the right of a nonconforming owner to repair or restore structures which have been accidentally destroyed. Where such a statutory provision protects the right of a nonconforming owner to repair a structure which has been partially destroyed, the provision has been construed to require termination of the nonconforming use only if the structure in which it has been operated is totally destroyed. Where this type of statutory provision exists, the issue in a case involving destruction of a structure housing a nonconforming use is

Mayer-Wittmann *v.* Zoning Board of Appeals

The Rathkopf treatise quotes at length from a case decided by the Colorado Supreme Court explaining why such regulations pass constitutional muster: " 'If a property owner has invested money in improvements in order to put his property to a particular use, which is lawful at that time, and if that use is subsequently outlawed by a zoning ordinance, he loses not only the potential use but also the value of his investment. To impose this additional loss upon him is unreasonable, and therefore he is entitled to continue to use his property as he did before. On the other hand, if the improvements are destroyed or abandoned, he has lost the value of his investment independently of the ordinance and there is no reason why his relationship to the zoning ordinance should be any different [than] that of his neighbor whose property was unimproved. . . . If the owner of a nonconforming use suffers the destruction of his improvements, he becomes the owner of unimproved property. The unimproved property may be restricted as to use without a denial of due process. The effect of the fire which substantially destroyed the service station was to sever the improvements from the real estate. Had the [plaintiff] been denied a building permit for a filling station on unimproved property, no one could contend that it was unreasonable or that it was a denial of due process.' " Id., pp. 74-39 through 74-40, quoting *Service Oil Co.* v. *Rhodus*, 179 Colo. 335, 347–48, 500 P.2d 807 (1972).

The majority contends that the casualty doctrine would not permit the zoning board to deny a variance in the present case because, in the absence of a variance, Breunich would "lose the *entire* value of the sea cottage"; (emphasis in original) footnote 13 of the majority

whether the extent of the destruction found is partial or is so extensive as to amount to total destruction." (Footnotes omitted.) 4 E. Ziegler, supra, § 74:11, p. 74-40. The relevant Connecticut statute contains no such provision. See General Statutes § 8-2.

Mayer-Wittmann *v.* Zoning Board of Appeals

opinion; whereas the cases finding no constitutional violation involve situations in which the landowner remains able to make some other use of the property despite the loss of a building to fire or other casualty. As I pointed out in my discussion of *Hillman*; see footnote 5 of this concurring opinion; the majority's point conflates two different calculations, the loss of value in *the nonconforming building* and the loss of value in *the property*. The former calculation is used in many zoning regulations, including Stamford's, to determine whether the landowner has the right, without a variance, to rebuild a nonconforming building after it has been damaged; the latter calculation is used to decide whether just compensation must be paid by a municipality that has prohibited restoration. The fact that the landowner may lose the entire value of the damaged structure is not the critical issue under either calculation. Indeed, the more severe the loss caused by the casualty to the building itself, the *stronger* the case becomes for application of the casualty doctrine because its applicability depends on the loss being caused by a force *other than the zoning regulation*. See, e.g., *Krul* v. *Board of Adjustment*, 122 N.J. Super. 18, 24–25, 298 A.2d 308 (Law. Div. 1972) ("The right to restore or repair thus is limited by the caveat that the structure be only partially destroyed. . . . Thus where the destruction of a building is only partial, restoration or repair is permitted to protect and maintain that investment in recognition of the right of the property owner to continued protection of his use free of the restriction imposed subsequent to the vesting of that use. If, however, a structure is destroyed totally rather than partially, the property owner in effect holds only vacant land and should be controlled by the existing zoning restrictions in the same manner as other owners of undeveloped land. Under such circumstances the dilemma of the property owner—the loss of his investment—is one created by the unfortunate casualty and

Mayer-Wittmann *v.* Zoning Board of Appeals

not by virtue of the power of government.'' [Citations omitted.]), aff'd, 126 N.J. Super. 150, 313 A.2d 220 (App. Div. 1973).[7]

## II

That said, I nonetheless agree with the outcome reached by the majority because I do not believe that

---

[7] In a similar vein, the majority opinion states that the present case is distinguishable from *Hillman*, *Piccolo*, and the other casualty doctrine cases because, in contrast to those cases, the landowner here had no options: ''[T]here is no evidence in the present case that Breunich would be able to construct a conforming structure of some type on the property if the variances were denied, and he would therefore lose the *entire* value of the sea cottage.'' (Emphasis in original.) Footnote 13 of the majority opinion. I see two interconnected problems with this contention. First, the idea underlying the casualty doctrine is not that the constitution allows local governments to adopt regulations prohibiting restoration of the nonconforming structure only if the owner is able to recover its loss by building a conforming structure. Instead, as I discussed in the text accompanying this footnote, the underlying idea is that, when the damage caused by the casualty is sufficiently severe, the government does not cause the loss and, therefore, need not permit restoration at all, especially in light of the background principle that nonconformities should be reduced or eliminated over time. See *Salerni* v. *Scheuy*, 140 Conn. 566, 570, 102 A.2d 528 (1954) (''[i]t is a general principle in zoning that nonconforming uses should be abolished or reduced to conformity as quickly as the fair interest of the parties will permit'').

Second, even if I were to assume, as the majority does, that the refusal to permit reconstruction of the nonconforming sea cottage in this particular case resulted in Breunich being unable to replace it by building a conforming structure elsewhere on the property—meaning that he has lost ''the *entire* value of the sea cottage''—there would still be no viable claim of a *constitutional* violation on this record. (Emphasis in original.) Footnote 13 of the majority opinion. As I noted previously, the takings analysis in this context looks to the diminished value to the entire property, not to the loss in value to the structure (or use) that cannot be restored. This approach is consistent with the treatment of takings more generally, where the constitutional analysis turns on the impact of the regulation on the *total* value of the property, not only the component of the property ''confiscated'' by the regulation. See *Murr* v. *Wisconsin*, U.S. , 137 S. Ct. 1933, 1943–44, 198 L. Ed. 2d 497 (2017) (holding that existence of regulatory taking is determined by comparing value that has been taken from property with value that remains in property viewed in its entirety). I have found nothing in the case law to support the majority's suggestion that the *constitutional* analysis is based on the loss of the destroyed building itself without reference to the value of the entire property.

Mayer-Wittmann *v.* Zoning Board of Appeals

our precedent, properly construed, requires a zoning board to deny a variance in all cases where the landowner fails to make the showing necessary to establish a constitutional violation, i.e, that enforcement of the zoning requirement has deprived the property of all reasonable use and value, thereby practically confiscating the property. That strict standard applies to claims based on *economic* hardship, but there are situations where a landowner may establish the necessary hardship without satisfying the constitutional standard, and this is such a case. The sea cottage, a legally nonconforming accessory structure, was severely damaged by a catastrophic natural event; the demands of public health and safety had caused both the local and federal governments to enact flood regulations of such importance that compliance was required, despite the special status accorded to nonconforming structures; "as before" restoration was flatly impossible due to the particular location of the property and related soil conditions; and Breunich, the landowner, had made good faith efforts to reduce the nonconformities to the maximum extent possible under the circumstances. In my view, the zoning board did not act unlawfully when it determined that this confluence of factors combined to subject the landowner, through no fault of his own, to an unusual hardship warranting issuance of the requested variances.

I observe at the outset that the standard of review is correctly summarized by the majority opinion, and must not be overlooked in our consideration of the merits. See *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 205–206, 658 A.2d 559 (1995) ("The standard of review on appeal from a zoning board's decision to grant or deny a variance is well established. We must determine whether the trial court correctly concluded that the board's act was not arbitrary, illegal or an abuse of discretion. . . . Courts are not to substitute their

Mayer-Wittmann *v.* Zoning Board of Appeals

judgment for that of the board . . . and decisions of local boards will not be disturbed so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . Upon appeal, the trial court reviews the record before the board to determine whether it has acted fairly or with proper motives or upon valid reasons. . . . We, in turn, review the action of the trial court. . . . The burden of proof to demonstrate that the board acted improperly is upon the plaintiffs.'' [Citations omitted; internal quotation marks omitted.]); see also *Caruso* v. *Zoning Board of Appeals*, 320 Conn. 315, 321, 130 A.3d 241 (2016) (''[a] zoning board of appeals is endowed with a liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal'' [internal quotation marks omitted]).[8]

The path to affirmance, in my view, does not require us to ascend to constitutional heights. As the majority correctly points out in quoting *E & F Associates, LLC* v. *Zoning Board of Appeals*, 320 Conn. 9, 15, 127 A.3d 986 (2015), a variance may be granted upon a showing by the landowner that, '' 'because of some peculiar characteristic of [the] property, the strict application of the zoning regulation produces an unusual hardship, as opposed to the general impact which the regulation has on other properties in the zone. . . . Accordingly, we have [concluded that a zoning board of appeals may] grant a variance only when two basic requirements are satisfied: (1) the variance must be shown not to affect

---

[8] This situation should not be confused with that in which the hardship claim is made on the basis of economic hardship and the underlying facts indisputably establish that the property retains some economically viable use, in which case the standard of review is plenary. *E & F Associates, LLC* v. *Zoning Board of Appeals*, 320 Conn. 9, 14–15, 127 A.3d 986 (2015) (''[T]he question of whether the board had authority to grant a variance pursuant to [General Statutes] § 8-6 (a) when the property would not lack economic value even if the variance were denied is a question of law. Accordingly, our review is plenary.'').

Mayer-Wittmann *v.* Zoning Board of Appeals

substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan. . . . Proof of exceptional difficulty or unusual hardship is absolutely necessary as a condition precedent to the granting of a zoning variance.' '' This legal standard is prescribed by statute; see General Statutes § 8-6 (a) (3);[9] and we must be careful not to change its meaning by judicial gloss.

Under the circumstances of this case, I do not agree with the majority that the statutory hardship standard is effectively "one and the same" as the legal standard establishing a constitutional violation under the takings clause. I certainly understand how the majority arrived at this conclusion, because our cases, especially recently, paint with the same broad brush in describing the hardship doctrine.[10] Unfortunately, some of these

[9] Section 8-6 (a) provides in relevant part: "The zoning board of appeals shall have the following powers and duties . . . (3) to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and intent and with due consideration for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of such bylaws, ordinances or regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety and welfare secured, provided that the zoning regulations may specify the extent to which uses shall not be permitted by variance in districts in which such uses are not otherwise allowed. . . .''

[10] See, e.g., *Barton* v. *Norwalk*, 326 Conn. 139, 148 n.6, 161 A.3d 1264 (2017) ("[t]he unusual hardship test in zoning variance cases and the substantial destruction test in inverse condemnation cases require a showing that the property cannot be utilized for any reasonable purpose"); *Caruso* v. *Zoning Board of Appeals*, supra, 320 Conn. 322–23 ("Unusual hardship may be shown by demonstrating that the zoning regulation has deprived the property of all reasonable use and value, thereby practically confiscating the property. This contention 'sits at the intersection of two related, yet distinct, areas of law: land use regulation and constitutional takings jurisprudence.' . . . In Connecticut, a taking occurs 'when a landowner is prevented from making any beneficial use of its land—as if the government had, in fact, confiscated

Mayer-Wittmann *v.* Zoning Board of Appeals

cases have overlooked an important doctrinal qualification when they observe that the zoning hardship standard is "the same" as the constitutional takings standard: the (very high) standard applied to adjudicate constitutional claims properly is used to decide variance applications *only when the landowner relies on a claim of economic or financial hardship to justify the variance.*

This critical doctrinal limitation can be discerned by a close reading of most of our zoning cases invoking the heightened standard, because those cases, which usually involve commercial landowners, indicate that the standard applies when the owner's hardship is based on the economic or financial impact of the zoning restriction at issue.[11] The qualification was more clearly

it.' . . . Accordingly, a zoning regulation 'permanently restricting the enjoyment of property to such an extent that it cannot be utilized for any reasonable purpose goes beyond valid regulation and constitutes a taking without due process.' . . . The same analysis is used in the variance context because, when the regulation 'practically destroys or greatly decreases [the property's] value for any permitted use to which it can reasonably be put' . . . the loss of value alone may rise to the level of a hardship." [Citations omitted.]).

[11] See, e.g., *E & F Associates*, *LLC* v. *Zoning Board of Appeals*, supra, 320 Conn. 16 ("considerations of financial disadvantage—or, rather, the denial of a financial advantage—do not constitute hardship, unless the zoning restriction greatly decreases or practically destroys [the property's] value for any of the uses to which it could reasonably be put" [internal quotation marks omitted]); *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 295, 947 A.2d 944 (2008) (same); *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 561, 916 A.2d 5 (2007) ("Disadvantage in property value or income, or both, to a single owner of property, resulting from application of zoning restrictions, does not, ordinarily, warrant relaxation in his favor on the ground of . . . unnecessary hardship. . . . Financial considerations are relevant only in those exceptional situations where a board could reasonably find that the application of the regulations to the property greatly decreases or practically destroys its value for any of the uses to which it could reasonably be put and where the regulations, as applied, bear so little relationship to the purposes of zoning that, as to particular premises, the regulations have a confiscatory or arbitrary effect." [Internal quotation marks omitted.]); *Grillo* v. *Zoning Board of Appeals*, 206 Conn. 362, 369, 537 A.2d 1030 (1988) (same).

Mayer-Wittmann *v.* Zoning Board of Appeals

evident in some of our earlier cases.[12] I fear that if we are not careful, the qualification is at risk of being forgotten altogether.

The distinction between the constitutional standard and the zoning law standard has been noted by various courts and commentators. See *Belvoir Farms Homeowners Assn.*, *Inc.* v. *North*, 355 Md. 259, 282, 734 A.2d 227 (1999) ("We reject the proposition that the unnecessary or unwarranted hardship standard is equal to an unconstitutional taking standard. If this were true, it would be a superfluous standard because the constitutional standard exists independent of variance standards."); *First North Corp.* v. *Board of Zoning Appeals*, 8 N.E.3d 971, 984 (Ohio 2014) ("[T]he unnecessary hardship standard for granting use variances is not the same as the constitutional taking standard. The 'hardship' standard necessarily admits that there is *some* use for land, but that use works an unnecessary hardship on the

---

[12] A good example is the following statement of the hardship doctrine authored by Chief Justice Maltbie in *Devaney* v. *Board of Zoning Appeals*, 132 Conn. 537, 542–43, 45 A.2d 828 (1946): "Disadvantage in property value or income, or both, to a single owner of property, resulting from application of zoning restrictions, does not, ordinarily, warrant relaxation in his favor on the ground of practical difficulty or unnecessary hardship. Financial considerations alone . . . cannot govern the action of the [zoning] board. . . . Otherwise, there would be no occasion for any zoning law. . . . There are, however, situations where the application of zoning to a particular property greatly decreases or practically destroys its value for any permitted use and the application of the ordinance bears so little relationship to the purposes of zoning that, as to that property, the regulation is in effect confiscatory or arbitrary. . . . Provisions authorizing variation in the application of the ordinance are designed to permit changes which will prevent such results. . . . *Where the only basis of the claim is economic loss from the application of the ordinance*, there rarely would be justification for a variation unless this test is met. *Where other considerations enter into the situation, the question necessarily must be left to the sound discretion of the board, acting within the limitations which we have pointed out, and always with regard to serving the general purposes to accomplish which a zoning ordinance is adopted and to the necessity that all property owners within a zone be treated fairly and equally*." (Citations omitted; emphasis added; internal quotation marks omitted.)

Mayer-Wittmann *v.* Zoning Board of Appeals

landowner. The taking standard . . . is one applying to 'a regulation that permanently requires a property owner to sacrifice all economically beneficial uses of his or her land.' . . . The difference between the two standards explains why a variance from a zoning ordinance can be granted under conditions in which the application of that particular zoning ordinance would not result in an unconstitutional taking of property." [Citation omitted; emphasis in original.]); *State* v. *Board of Adjustment*, 244 Wis. 2d 613, 642, 628 N.W.2d 376 (2001) ("[t]he unnecessary hardship standard 'is *neither* the same nor as demanding as a takings analysis' " [emphasis in original]); 8 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1991) § 25.167, p. 761 ("[a] condition of difficulty or hardship is not deemed equivalent to a taking of property, in the constitutional sense").[13]

Once the limitation is acknowledged, the legal analysis applicable to the present case becomes straightforward. As previously mentioned, the question is whether the plaintiff has carried his burden of proving that the zoning board abused its discretion when it found that (1) the variances do not substantially affect the comprehensive zoning plan, and (2) adherence to the strict letter of the relevant zoning ordinances causes Breunich to suffer an unusual hardship unnecessary to carrying out the general purpose of the zoning plan. See *E & F Associates, LLC* v. *Zoning Board of Appeals*, supra, 320 Conn. 15.

The variance application at issue in this case did not rely at all on a claim of financial deprivation. The basis

---

[13] Although, to the best of my knowledge, the distinction has not clearly been made in any holding of this court, Justice Shea articulated the point with precision in a dissenting opinion: "Such a finding was not essential in order to satisfy the requirement of 'unusual hardship' for a variance, because a zoning board of appeals is not restricted to providing relief only in situations where enforcement of the regulations would create a hardship sufficient to constitute an unconstitutional taking." *Adolphson* v. *Zoning Board of Appeals*, 205 Conn. 703, 720, 535 A.2d 799 (1988) (*Shea, J.*, dissenting).

Mayer-Wittmann *v.* Zoning Board of Appeals

for the requested variances was not that Breunich's property had lost value or his income would be diminished unless he was allowed to rebuild the sea cottage. His claim, rather, was predicated on the unusual nature of the hardship suffered as a result of the confluence of four factors: (1) the sea cottage is a century old nonconforming structure that will be gone forever if a variance is not granted;[14] (2) the sea cottage is located within the VE and AE Flood Zones under FEMA standards, which are incorporated into the zoning regulations; (3) "it would be impossible for [Breunich] to meet the more stringent flood zone restrictions without further increasing the height of the sea cottage"; and (4) although the zoning regulations had been amended to dispense with the need for variances for main houses, the sea cottage is an accessory structure for which a variance is required. Under these unusual factual circumstances, moreover, the zoning board concluded that the requested variances did not undermine the comprehensive zoning plan but, to the contrary, brought "the sea cottage into compliance with the current FEMA and city of Stamford flood regulations."

I would hold that the zoning board was entitled to determine, as it did, that Breunich satisfied the applica-

[14] Breunich's interest in preventing the complete loss of the nonconforming sea cottage is significant, not because it is entitled to constitutional protection under these circumstances, but because it represents something significantly different than a desire to expand a nonconformity or modernize a structure merely to satisfy the personal preferences of the owner. In combination with the other three factors identified here, this consideration distinguishes the present case from situations in which courts have concluded that a hardship has not been established. See *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 691, 111 A.3d 473 (2015) ("The case law is replete with instances in which an applicant predicated its claim of hardship on a desire to expand an existing nonconforming structure for what our appellate courts have characterized as personal considerations, such as the desire to obtain more space or to modernize an antiquated building. It long has been held that 'disappointment in the use of property can hardly constitute practical difficulty or unnecessary hardship within the meaning of a zoning law or regulation.' ").

Mayer-Wittmann *v.* Zoning Board of Appeals

ble legal standard required to establish an unusual hardship. The sea cottage was severely damaged by a hurricane. It could not be rebuilt exactly as before due to FEMA and city of Stamford flood regulations. These regulations not only relate directly to public health and safety,[15] but, as the majority emphasizes, the failure of a municipality to promulgate and enforce such regulations could render properties throughout the entire municipality ineligible for protection under the National Flood Insurance Program, a federal program making flood insurance available to those who would otherwise be unable to procure it.

This confluence of factors—a catastrophic natural event causing severe damage, property conditions and legal imperatives making "as before" restoration flatly impossible, and good faith efforts by the landowner to reduce the nonconformities to the maximum extent possible under the circumstances—are sufficient, in my view, to warrant the zoning board's finding that Breunich had established the existence of an unusual hardship, and I therefore would affirm the judgment of the trial court dismissing the appeal. I note that two other trial courts recently have reached similar conclusions in similar cases involving the reconstruction of storm damaged, nonconforming beachfront homes. See *Turek* v. *Zoning Board of Appeals*, Superior Court, judicial district of Hartford, Docket No. LND-CV-15-6063404-S

---

[15] The trial court recognized this point: "[T]he increased nonconformity does not have the singular purpose of enhancing [Breunich's] personal use of the sea cottage, but instead has the purpose of bringing the sea cottage into compliance with the current FEMA and city of Stamford flood regulations. The only way for [Breunich] to comply with both of these regulations is to increase the height of the structure by elevating the lowest horizontal point of the home an additional eight feet. . . . The record shows that the usable space of the sea cottage is not increasing, but the existing structure is simply moving upward and three feet north to meet flood requirements. . . . In addition, the livable space within the sea cottage is not changed as a result of the variance." (Citations omitted.)

Mayer-Wittmann *v.* Zoning Board of Appeals

(April 4, 2018) (66 Conn. L. Rptr. 363, 361); *Kwesell*
v. *Zoning Board of Appeals*, Superior Court, judicial
district of New Haven, Docket No. NNH-CV-15-
6056545–S (May 25, 2017) (64 Conn. L. Rptr. 549,
552–54).

Little needs to be said in response to the plaintiff's
argument that the zoning board erroneously concluded
that the hardship suffered by Breunich was not differ-
ent in kind from that generally affecting properties in
the same zone. See, e.g., *Garibaldi* v. *Zoning Board of
Appeals*, 163 Conn. 235, 238, 303 A.2d 743 (1972) ("[i]t
is clear that for a hardship to justify the granting of a
variance, the hardship must be different in kind from
that affecting generally properties in the same zoning
district") There is no reason to partake in the majority
opinion's willingness to assume the truth in the plain-
tiff's contention on this point. The plaintiff misappre-
hends the issue by arguing that there are many other
properties in the flood zone required to comply with
the applicable flood regulations, there were many other
buildings destroyed by Hurricane Sandy, and nothing
makes Breunich's case special. The argument misses
the fact that Breunich's contention was that his hard-
ship consisted of the unusual confluence of factors
and features making his situation different, namely, the
hurricane's destruction of a nonconforming accessory
structure located in a highly restrictive flood zone sub-
ject to the mandatory flood regulations. The plaintiff,
for his part, offers nothing but speculative hypotheses
to suggest that any significant number of other land-
owners were similarly affected. On the other hand, the
transcript of the zoning board's meeting on Breunich's
application reflects both that its members were fully
aware of the legal standard requiring an unusual impact
on the applicant, and that the board, upon consider-
ation, found that this requirement had been met.[16] See

---

[16] At that meeting, a member of the zoning board observed that Breunich's
situation was "differen[t]" because it involved an accessory building rather

672 NOVEMBER, 2019 333 Conn. 624

Mayer-Wittmann *v.* Zoning Board of Appeals

*Francini* v. *Zoning Board of Appeals*, 228 Conn. 785, 791, 639 A.2d 519 (1994) (noting that zoning board members "are entitled to take into consideration whatever knowledge they acquire by personal observation" [internal quotation marks omitted]).

For these reasons, I agree with the majority's conclusion that "the trial court correctly determined that the zoning board properly granted Breunich's application for variances from the regulations and, therefore, properly dismissed the plaintiff's appeal." Accordingly, I concur in the judgment.

––––––––––––––––––

than a "main house," which was subject to different regulations. While they expressed some uncertainty, the members of the zoning board opined that there are "a few," but "not many," such structures in Stamford.